In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3756

OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.,
MARK ELROD, and RICHARD PINGEL,

*Petitioners,*

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,

*Respondents.*

On Petition for Review of the Final Rule of the
Federal Motor Carrier Safety Administration.
FMCSA-2010-0167.

ARGUED SEPTEMBER 13, 2016 — DECIDED OCTOBER 31, 2016

Before BAUER, KANNE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Since 1935, federal law has regulated the hours of service of truck drivers operating in interstate commerce. The regulations are intended to reduce fatigue-related accidents, and they require drivers to keep paper records showing their driving time and other on-duty time. Compliance has long been an issue, though, because it

is easy to insert an error in paper records, whether intentionally or not.

In 2012, Congress directed the Department of Transportation to issue regulations to require most interstate commercial motor vehicles to install electronic logging devices (ELDs). ELDs are linked to vehicle engines and automatically record data relevant to the hours of service regulations: whether the engine is running, the time, and the vehicle's approximate location. The devices are intended to improve drivers' compliance with the regulations, to decrease paperwork, and ultimately to reduce the number of fatigue-related accidents. Congress instructed the Department in promulgating the rule to consider other factors as well, such as driver privacy and preventing forms of harassment enabled by the ELDs. 49 U.S.C. § 31137. The Federal Motor Carrier Safety Administration, which is part of the Department of Transportation, promulgated the final rule requiring ELDs in 2015. Electronic Logging Devices and Hours of Service Supporting Documents, 80 Fed. Reg. 78,292 (Dec. 16, 2015) ("Final ELD Rule"), codified in 49 C.F.R. Pts. 385, 386, 390, and 395.

Petitioners Mark Elrod, Richard Pingel, and the Owner-Operator Independent Drivers Association (OOIDA) brought this action for judicial review of the final rule. Elrod and Pingel are professional truck drivers, and OOIDA is a trade organization. They argue that the agency's final rule should be vacated for five reasons. We uphold the final rule and deny their petition.

Petitioners claim first that the final rule is contrary to law because it permits ELDs that are not entirely automatic. We disagree. Petitioners' reading of the statute seeks to pit one statutory requirement against another rather than allow the

agency to balance competing policy goals endorsed by Congress. Second, petitioners argue that the agency used too narrow a definition of "harassment" that will not sufficiently protect drivers. This claim also fails. When defining harassment, the agency sought input from drivers, motor carriers, and trade organizations; it considered administrative factors; and it ultimately provided a reasonable definition of the term. Third, petitioners argue that the agency's cost-benefit analysis was inadequate and fails to justify implementation of the ELD rule. However, the agency did not need to conduct a cost-benefit analysis for this rule, which was mandated by Congress. Even if such analysis were required, the studies were adequate. Fourth, petitioners argue that the agency did not sufficiently consider confidentiality protections for drivers. The agency, however, adopted a reasonable approach to protect drivers in this regard.

Fifth, petitioners argue that the ELD mandate imposes, in effect, an unconstitutional search and/or seizure on truck drivers. We find no Fourth Amendment violation. Whether or not the rule itself imposes a search or a seizure, inspection of data recorded on an ELD would fall within the "pervasively regulated industry" exception to the warrant requirement. The agency's administrative inspection scheme for such information is reasonable.

I.  *Factual and Regulatory Background*

The agency's road to the 2015 final rule was long and rocky. That history is relevant to several of petitioners' arguments, particularly the claims that ELDs must be entirely automatic, that ELD benefits do not outweigh their costs, and that the ELD mandate violates the Fourth Amendment.

A.  *Federal Regulation of Commercial Motor Vehicles*

In the early twentieth century, commercial motor vehicles were largely regulated by individual states. See John J. George, *Federal Motor Carrier Act of 1935*, 21 Cornell L. Rev. 249, 249-51 (1936). This decentralized system ran into dormant commerce clause problems. In a series of cases, the Supreme Court struck down state regulations of commercial motor vehicles that interfered with interstate commerce. See, e.g., *Buck v. Kuykendall*, 267 U.S. 307 (1925) (striking down state's attempt to require certificate of "public convenience" to compete in commercial interstate transportation); *George W. Bush & Sons Co. v. Maloy*, 267 U.S. 317 (1925) (same); *Interstate Transit, Inc. v. Lindsey*, 283 U.S. 183 (1931) (striking down state tax on privilege of providing interstate bus transportation). In 1935, Congress responded by passing the Federal Motor Carrier Act of 1935, Pub. L. No. 255, § 201, 49 Stat. 543.

The Act delegated authority to the Interstate Commerce Commission to regulate many elements of interstate freight and passenger motor vehicle traffic. Most relevant for this case, the Act directed the Commission to regulate the maximum hours of service for commercial drivers. *Id.*, § 204(a)(1). Regulating hours of service was intended to promote highway safety by reducing accidents related to driver fatigue. 79 Cong. Rec. 12209-37 (1935). This remains the goal of the hours of service regulations today. Final ELD Rule, 80 Fed. Reg. at 78,303. Jurisdiction over the regulations moved to the Federal Highway Administration in 1995 and then to the new Federal Motor Carrier Safety Administration in 2000. See Interstate Commerce Commission Termination Act, Pub. L. 104-88, 109 Stat. 803 (1995); *Owner-Operator Independent Drivers Ass'n*

*v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188, 193 (D.C. Cir. 2007) (discussing regulatory history).

The regulations require drivers to document four possible statuses: (1) driving; (2) on duty, not driving; (3) in the sleeper berth; and (4) off duty. 49 C.F.R. § 395.8(b). They set out maximum times for driving and require a minimum number of hours off duty each day. They also establish the maximum permissible on-duty time for each week.

Driver status has been traditionally documented through paper logs called the "Record of Duty Status." Drivers are required to keep copies of these records for seven days before submitting them to their motor carrier. 49 C.F.R. § 395.8(k)(2). The carrier must retain copies for six months. § 395.22(i)(1). Both drivers and carriers must provide these records to authorized safety officials during roadside inspections or audits. If a driver violates the hours of service or fails to maintain her records accurately, she may be placed out of service. § 395.13.

These paper records have been ongoing sources of concern because they are easy to falsify. For example, a driver could exceed the cap on continuous driving (11 hours), but fail to record the excess hours. § 395.3(a)(3)(i). There is evidence that falsification of paper records occurs on a regular basis. 65 Fed. Reg. 25,540, 25,558 (May 2, 2000) (agency noting that hours of service violations are widespread). The paper records are also vulnerable to human error. Final ELD Rule, 80 Fed. Reg. at 78,303. These concerns were part of the impetus to update the hours of service regulations.

B.  *Efforts to Update the Hours of Service Regulations*

In 1995, Congress directed the agency to revise the hours of service regulations for commercial motor vehicles. Pub. L. 104-88 § 408, set out as note under 49 U.S.C. § 31136 (1996 Supp.). The Agency then tried to modernize the regulations. The agency's proposed new rules have been struck down three times, twice by the Court of Appeals for the District of Columbia Circuit and once by this court.

In 2003 the agency issued a new final rule that overhauled the hours of service rules. 68 Fed. Reg. 22,456 (Apr. 28, 2003). The rule altered various requirements, including the length of the daily driving limit, the daily off-duty requirement, and the weekly on-duty maximum. See *id.* at 22,457, 22,501–02. The D.C. Circuit vacated the rule because the "agency failed to consider the impact of the rules on the health of drivers, a factor the agency must consider under its organic statute." *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

The agency then issued a revised final rule in 2005. 70 Fed. Reg. 49,978 (Aug. 25, 2005). The D.C. Circuit again held that the agency erred. *Owner-Operator Independent Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188 (D.C. Cir. 2007). This time, the agency violated the Administrative Procedure Act by failing to provide sufficient opportunity for interested parties to comment on the method that justified the change in the hours of service rules. The agency also failed to explain sufficiently certain elements of that method. *Id.* at 193.

Within the agency's broader efforts to update the hours of service rule was a narrower issue of electronic monitoring. Be-

fore promulgating the 2003 rule, the agency considered requiring electronic on-board recorders (EOBRs), which are the technical and regulatory predecessors of ELDs. See 65 Fed. Reg. 25,540, 25,598 (May 2, 2000). The agency considered requiring EOBRs in response to Congress's 1995 directive to issue an advance notice of proposed rulemaking "dealing with a variety of fatigue-related issues pertaining to commercial motor vehicle safety … including … automated and tamperproof recording devices." Pub. L. 104-88 § 408, set out as note under 49 U.S.C. § 31136 (1996 Supp.).[1]

While the proposed rule would have required EOBRs, the agency decided not to require them at that time. 68 Fed. Reg. 22,456, 22,488 (Apr. 28, 2003). The D.C. Circuit vacated the 2003 rule on other grounds but also admonished the agency for failing to respond adequately to the statutory directive to "deal[] with … automated and tamperproof recording devices," noting that the agency's decision on that point was "probably flawed." *Public Citizen*, 374 F.3d at 1220-22.

In response, the agency further investigated EOBRs. In 2004, the agency issued an optional advanced notice of proposed rulemaking, which indicated that it was still considering EOBR implementation. 69 Fed. Reg. 53,386 (Sept. 1, 2004). Then, in 2007 the agency issued a formal notice of proposed rulemaking that considered three issues: (1) EOBR performance standards; (2) mandatory use of EOBRs for motor carriers that regularly violated hours of service rules; and (3) incentives to promote voluntary use of EOBRs. 72 Fed. Reg.

---

[1] This statute was first directed to the Federal Highway Administration in 1995, but that agency never took any action. The responsibility then fell to the Federal Motor Carrier Safety Administration.

2,340, 2,343 (Jan. 18, 2007). The final rule issued in 2010 required, among other things, that motor carriers "that have demonstrated serious noncompliance with the HOS [hours of service] rules will be subject to mandatory installation of EOBRs." 75 Fed. Reg. 17,208, 17,208 (Apr. 5, 2010). This rule led to the agency's third rebuke by the courts.

In 2011, this court vacated the final rule regarding EOBRs. *Owner-Operator Independent Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580 (7th Cir. 2011) ("*OOIDA I*"). As in the D.C. Circuit's 2003 decision, we found that the agency had failed to consider a statutory requirement: to ensure that electronic monitoring would not be used to harass drivers. 49 U.S.C. § 31137(a) (2011). Instead of building in safeguards to prevent EOBRs from being used to harass drivers, the agency had provided "a single conclusory sentence in the final rule-making to the effect that the Agency 'has taken the[] statutory requirement[] into account throughout the final rule.'" *OOIDA I*, 656 F.3d at 588. This shortcoming rendered the final rule arbitrary and capricious. See 5 U.S.C. § 706.

C. *The Current Challenge to ELDs*

In 2012, Congress stepped in again and passed the Commercial Motor Vehicle Safety Enhancement Act of 2012. This time Congress was more direct. It ordered the Secretary of Transportation to issue regulations requiring most commercial vehicles to "be equipped with an electronic logging device to improve compliance by an operator of a vehicle with hours of service regulations." 49 U.S.C. § 31137(a)(1). The Act specified several factors for the Secretary to consider in implementing the ELD mandate, including the potential for harassment, § 31137(a)(2); the potential to reduce paper documents,

§ 31137(d)(1); driver privacy, § 31137(d)(2); and the confiden-
tiality of personal data, § 31137(e).

To comply with this statutory mandate, the agency issued
its final rule in 2015. Final ELD Rule, 80 Fed. Reg. 78,292 (Dec.
16, 2015). The rule (1) mandates ELDs for all vehicles that are
currently required to maintain hours of service records; (2)
provides technical specifications for ELDs; (3) clarifies the ex-
tent to which supporting paperwork is required; and (4)
adopts provisions to ensure that ELDs are not used to harass
drivers. *Id.* at 78,293. The compliance date for the ELD man-
date is set for December 18, 2017, *id.* at 78,292, and it will affect
an estimated 3.5 million drivers.

The rule prescribes requirements for ELDs. They must au-
tomatically link to vehicle engines when the engines turn on,
and they must record the date, time, location, engine hours,
vehicle miles, driver identification, vehicle identification, and
motor carrier identification. 49 C.F.R. § 395.26. The collection
of this data is intentionally limited in scope. Instead of contin-
uously tracking this information, ELDs record only at speci-
fied times, such as when the vehicle is turned on, when the
duty status changes, and once per hour while driving. *Id*. In
addition, ELDs do not pinpoint a vehicle's exact location.
They provide location only within a one-mile radius. Final
ELD Rule, 80 Fed. Reg. at 78,296. As with the paper records,
authorized safety officials may review ELD data without a
warrant at roadside inspections and during audits of motor
carriers. 49 C.F.R. § 395.24(d); § 395.22(j).

II. *Analysis*

We now turn to petitioners' five arguments for vacating the 2015 final rule: (a) ELDs will not record enough information automatically; (b) the rule fails to protect drivers sufficiently from harassment; (c) the rule's benefits will not outweigh its costs; (d) the rule fails to protect the confidentiality of personal data collected by ELDs; and (e) the rule violates the Fourth Amendment's prohibition against unreasonable searches and seizures.

A. *"Automatically"*

Petitioners first argue that ELDs must be entirely automatic to comply with Congress's mandate. The statute directs the agency to issue regulations requiring an electronic monitoring device that "is capable of recording a driver's hours of service and duty status accurately and automatically." 49 U.S.C. § 31137(f)(1)(A). Petitioners argue that "automatically" means *entirely* automatic; no human involvement is permitted. They contend the device must be capable of automatically recording when a driver changes between the four statuses: driving; on duty, not driving; sleeper berth; and off duty. Petitioners also argue that if drivers must manually enter any information into the ELDs, this will enable falsification and defeat the purpose of the statute. For instance, the ELDs prescribed in the rule cannot automatically capture on-duty, non-driving work, such as loading a truck. If a driver must manually input this status, she could falsify the record.

It is unclear what devices petitioners envision, and they do not say. Such a device would need to monitor quite a few variations in human activity. If the device must function *entirely automatically*, how should it record a driver's change from "off

duty" to "on-duty, not driving"? According to petitioners, a driver may not clock-in manually; that would not be automatic. Or what if a driver is in the sleeper berth, but performing on-duty, non-driving work, such as reviewing a bill of lading? What type of device could tell the difference without any manual input?

Two possibilities are constant video surveillance or perhaps some form of bio-monitoring device.[2] But naming these possibilities shows why petitioners did not mention them: they would be breathtakingly invasive. Whether we review the agency's interpretation of "automatically" under *Chevron* or *Skidmore*, we are confident that Congress did not intend to require such invasive devices when it used the word "automatically." See *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (deferring to agency's reasonable interpretation of ambiguous statute); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) (deferring to agency's statutory interpretation to extent it is persuasive).

First, petitioners read the single word "automatically" in isolation, ignoring the rest of the statute. This runs contrary to the Supreme Court's repeated instruction to "construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. —, —, 135 S. Ct. 2480, 2489 (2015), citing *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010). We interpret statutes "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561,

---

[2] By way of illustration, NASA has experimented with devices to monitor astronauts' sleep patterns. See, e.g., NASA, *Wearable System for Sleep Monitoring in Microgravity (Wearable Monitoring)*, July 14, 2016, http://www.nasa.gov/mission_pages/station/research/experments/1279.html.

569 (1995), and "fit, if possible, all parts into an harmonious whole," *Federal Trade Comm'n v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959). Here, other parts of the statute provide important context for the "automatic" requirement. For instance, the statute also directs the agency to ensure that ELDs will not be used to harass drivers, 49 U.S.C. § 31137(a)(2), and to consider drivers' privacy, § 31137(d)(2). These provisions show that Congress meant for the agency to balance competing goals. The agency understood this and balanced the competing directives in a reasonable manner.

Second, petitioners' interpretation of "automatically" is belied by prior use of the word in precisely this context. When Congress was drafting the 2012 Act, it was aware of the EOBR rule this court vacated in 2011. See S. Rep. No. 112-238 at 4 (2012) (discussing EOBRs). The 2012 statutory mandate for ELDs in 49 U.S.C. § 31137 used the same language that described EOBRs in the previous agency rule: devices "capable of recording a driver's hours of service and duty status accurately and automatically." 49 C.F.R. § 395.2 (2010). If Congress had intended a very different sort of device—such as a bio-monitor—it would have given some indication. Instead, Congress used the same phrase, strongly implying that it intended a device with similar capabilities and limitations.

Third, under petitioners' reading of the statute, Congress hid a sweeping change—all-encompassing surveillance of commercial drivers—in the interpretation of the word "automatically." We are confident that Congress did not intend that. In construing arguably ambiguous statutory terms, it is usually prudent to assume that Congress does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. American Trucking Ass'ns*,

531 U.S. 457, 468 (2001). More colloquially, Congress does not "hide elephants in mouseholes." *Id.* We do not interpret "automatically" to require constant video surveillance or biomonitors. The ELDs prescribed by the agency function "automatically" within the meaning of § 31137.

B. *Driver "Harassment"*

Petitioners' second argument takes the tack opposite from the first: the final rule should be vacated because it does not protect drivers sufficiently from harassment. As noted, we vacated the 2011 rule because the agency failed to consider the statutory mandate to "ensure that the devices are not used to harass vehicle operators." *OOIDA I*, 656 F.3d at 582, citing 49 U.S.C. § 31137(a).

After our earlier decision, the agency sought input to determine how ELDs might be used to harass drivers. 76 Fed. Reg. 20,611 (Apr. 13, 2011). In 2012, the agency conducted two public listening sessions, with options for online participation. See Final ELD Rule, 80 Fed. Reg. at 78,320. It also conducted a survey of drivers and motor carriers regarding the potential for ELD-related harassment. *Id.* at 78,298. The agency received substantial feedback from drivers, motor carriers, and trade associations. It incorporated some of these suggestions into its final rule, including several suggestions from petitioner OOIDA. *Id.* at 78,321.

For purposes of this rule, the agency ultimately defined harassment as "an action by a motor carrier toward a driver … involving the use of information available to the motor carrier through an ELD … that the motor carrier knew, or should have known, would result in the driver violating § 392.3 [prohibiting driving when abilities may be impaired by fatigue,

illness, or "any other cause"] or part 395 [hours of service rules]." 49 C.F.R. § 390.36(a). In other words, ELD-related harassment can take two forms: when a motor carrier uses an ELD to encourage a driver to drive (1) when the driver's ability is somehow impaired; or (2) in violation of the hours of service rules.

Petitioners contend this definition is too narrow. They argue that by linking harassment to driver impairment and hours of service, the rule protects drivers from only a "very limited subset" of possible harassment. Similar to their argument about "automatically," petitioners claim that since the term "harassment" is unqualified in the statute, it must include *every* possible form of harassment.

On this issue the agency's interpretation of "harassment" is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*'s two-part test, we first ask if, using the "traditional tools of statutory construction," Congress has "directly spoken to the precise question at issue." *Id*. at 842, 843 n.9. If not, we proceed to *Chevron*'s second step and ask whether the agency's interpretation was "based on a permissible construction of the statute." *Id*. at 843.

Here, Congress has not "directly spoken" to the precise meaning and scope of the "harassment" mandate. As we said in 2011, the term harassment is "undefined in the statute and thus require[s] some amplification." *OOIDA I*, 656 F.3d at 588. Since Congress did not fill in the precise content, we assume that the "statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *King v. Burwell*, 576 U.S. at —, 135 S. Ct. at 2488, quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).

At *Chevron*'s second step, the agency's interpretation is reasonable.

Like the statute itself, the agency linked the definition of harassment to the use of ELDs. The agency explained that it intentionally tied the definition of harassment to specific regulatory violations to provide "objective criteria" for managing harassment allegations. Final ELD Rule, 80 Fed. Reg. at 78,326. The agency claims this will help its administrators, who are located throughout the country, address harassment complaints in a consistent and timely manner. *Id*.

The agency also bolstered its harassment definition in response to specific concerns raised by drivers during the notice-and-comment process. For instance, a number of drivers expressed concern that motor carriers would use ELDs to interrupt their sleep. *Id*. at 78,323, 78,326. In response, the agency required ELDs to include a mute function or volume control. 49 C.F.R. Pt. 395, Subpt. B, App. A 4.7.1(a). Drivers also expressed concern that carriers might pressure them to alter their ELD records. Final ELD Rule, 80 Fed. Reg. at 78,320, 78,323, 78,325. In response, the agency required that ELDs be made tamper-resistant, and the devices must retain a copy of their original records even if edited. *Id*. at 78,303. In addition, the agency adopted two specific proposals from petitioner OOIDA: it is expressly unlawful for motor carriers to use ELDs to harass drivers, and the agency established a process for drivers to file harassment complaints. *Id*. at 78,321.

The rule complies with the statutory mandate to protect drivers from harassment. The agency sought input from various stakeholders, considered logistical and administrability factors, and addressed specific concerns raised during out-

reach sessions. In *OOIDA I*, we said that the definition of harassment needed elaboration. The agency has provided it in a reasonable way.

Moreover, petitioners have not identified an instance of harassment that the agency's definition will leave unprotected. The one example that petitioners offer is based on a mistake. They argue that a motor carrier might pressure a driver to continue driving during dangerous weather conditions. Since this does not violate the hours of service rules, petitioners reason, it would not be considered "harassment" under the rule's definition. That is incorrect. This situation would fall under the other portion of the agency's definition, which covers situations where a motor carrier pressures a driver to drive when her ability is impaired for any reason. 49 C.F.R. § 392.3 (noting that motor carrier may not require a driver to operate a commercial vehicle "while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness *or any other cause*, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle") (emphasis added). The agency's definition of harassment thus reaches petitioners' hypothetical. And even if some forms of potential harassment might fall outside the agency's definition, that would not render its definition unreasonable.

## C. *Cost-Benefit Analysis*

Petitioners next challenge the agency's analysis of the costs and benefits of the ELD rule. They argue that the agency's calculation of the benefits is flawed because (1) ELDs will not improve hours of service compliance because they are not entirely automatic; and (2) the studies indicating otherwise are unreliable. We also reject this challenge. The agency was not

required to conduct a cost-benefit analysis for this particular rule. Even if it had been required to do so, its studies were sufficient.

Requiring ELDs was not left to the discretion of the agency; Congress mandated it. In the 2012 legislation, Congress did not instruct the Agency to *consider* requiring electronic monitoring, as it had in the Interstate Commerce Commission Termination Act of 1995. See Pub. L. 104-88 § 408, set out as note under 49 U.S.C. § 31136 (1996 Supp.). In 2012, Congress simply ordered the agency to *require* ELDs. Section 31137(a) states that the Secretary "shall prescribe regulations … requiring" commercial motor vehicles to be "equipped with an electronic logging device." Congress instructed the agency to consider certain other factors such as the potential for harassment, § 31137(a)(2); the potential to reduce paper documents, § 31137(d)(1); driver privacy, § 31137(d)(2); and the confidentiality of personal data, § 31137(e). Congress did not condition issuance of the rule on a cost-benefit analysis.

Petitioners claim that consideration of the costs and benefits of the § 31137 ELD mandate is required under § 31136. That is not correct. While § 31136 requires the agency to consider costs and benefits when promulgating minimum safety standards for commercial motor vehicles, § 31136(c)(2)(A), that requirement is expressly limited to regulations "under this section." § 31136(c)(2). It does not apply to § 31137, which contains the ELD mandate.

Section 31136 provides additional evidence that the agency was not required to perform a cost-benefit analysis or to ensure that benefits would exceed costs when implementing the ELD mandate. Congress knows how to require rulemakers to follow cost-benefit analyses when it wants, as

§ 31136 shows. See, e.g., *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 467 (2001) (EPA not permitted to consider costs when setting ambient air quality standards, in part because authority to consider cost had "elsewhere, and so often, been expressly granted" in Clean Air Act, but was not granted for standards in question). Even if the agency had done no cost-benefit analysis here, that would not invalidate the rule.

In any event, the agency's studies here were sufficient to justify the rule. In the Regulatory Impact Analysis, the agency relied on two studies. The first examined five motor carriers that had implemented electronic monitoring in their fleets for at least one year. This resulted in data on 8,545 roadside inspections of 5,792 commercial motor vehicles. Naturally, this sample size was relatively small because the ELD mandate had not yet been implemented at the national level. The agency supplemented this study with its Roadside Intervention Model.

The Roadside Intervention Model estimated the reduction in crashes that would result from a decrease in regulatory violations. To do this, the agency correlated the type and length of driving violations to crash risk. See U.S. Dep't Trans., Regulatory Impact Analysis §§ 2.5.4; 4.2–4.2.4 (Nov. 2015). Using data from January 2005 to September 2009, which involved 9.7 million roadside interventions, the agency estimated that the ELD mandate would result each year in 26 lives saved, 562 injuries avoided, and 1,844 crashes avoided. *Id.*, Executive Summary at vi, Table 4. While petitioners urge us to second-guess the agency's statistical judgment calls, we find that it exercised its expertise reasonably. See *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004) ("The agency's job is to exercise its expertise to make

tough choices about which of the competing estimates is most plausible, and to hazard a guess as to which is correct, even if the lack of a 'significant market for such [electronic logging] devices' means that the estimate will be imprecise.").[3]

D. *Confidentiality of ELD Information*

Section 31137(e) requires the agency to provide safeguards to preserve the confidentiality of the data collected by ELDs. Petitioners argue that the agency has failed to do so. They claim that this situation parallels *OOIDA I*, where the agency simply failed to consider a factor mandated by statute (in that case, driver harassment) beyond "a single conclusory sentence in the final rulemaking." *OOIDA I*, 656 F.3d at 588. Here, however, the agency provided a sufficient response by considering confidentiality in several respects.

First, as a general matter, the agency will not maintain the ELD data itself. Instead, drivers and motor carriers are responsible for maintaining and storing the information. 49 C.F.R. § 395.24(d); § 395.22(i)(1). The final rule also requires motor carriers to "retain a driver's ELD records so as to protect a driver's privacy in a manner consistent with sound business practices." § 395.22(i)(2).

---

[3] Even if petitioners were correct that the agency needed to conduct a cost-benefit analysis and that the agency's studies were inadequate, the benefits of ELDs would still outweigh the costs. Petitioners do not challenge the accuracy of the agency's estimate of total paperwork savings from the ELD mandate, nor do they challenge the agency's estimate of total costs of the mandate. Even apart from the benefits of accidents prevented, the estimated paperwork savings alone outweigh the costs of the ELD mandate. See U.S. Dep't Trans., Regulatory Impact Analysis, Executive Summary at v (Nov. 2015).

Second, the agency noted that existing regulations "govern the release of private information, including requests for purposes of civil litigation." Final ELD Rule, 80 Fed. Reg. at 78,322, citing 49 C.F.R. Pts. 7 and 9. The agency also highlighted broader federal privacy laws that will govern ELD data. *Id.*; see also Privacy Act, 5 U.S.C. § 552a (regulating the maintenance and use of agency records maintained on individuals). In this way, the agency showed that it considered the existing backdrop of confidentiality protections before issuing new rules.

Third, the agency said it will redact personal information before releasing confidential ELD-related data: "To protect data of a personal nature unrelated to business operations, the Agency would redact such information included as part of the administrative record before a document was made available in the public docket." Final ELD Rule, 80 Fed. Reg. at 78,322.

The agency's treatment of the confidentiality requirement is sufficient. It is a far cry from the prior lack of treatment of the harassment mandate in *OOIDA I*. While petitioners may have liked additional protections, the agency's treatment of the confidentiality requirement was not arbitrary or capricious.

E.  *The Fourth Amendment*

Petitioners claim that the ELD mandate is an unconstitutional "search" and "seizure." They also argue that the rule does not fall within the Fourth Amendment's exception for "pervasively regulated industries." Petitioners' arguments are unpersuasive. We need not resolve whether the ELD mandate constitutes a search or a seizure. Even if it did, it would be

reasonable under the Fourth Amendment exception for pervasively regulated industries.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." As a general rule warrantless searches are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009), citing *Katz v. United States*, 389 U.S. 347, 357 (1967). This protection applies to commercial property as well as to homes. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978).

One established exception is for administrative inspections of "pervasively regulated industries." In these industries, reasonable expectations of privacy are diminished because an individual who "embarks upon such a business … has voluntarily chosen to subject himself to a full arsenal of governmental regulation." *Id*. at 313. In such industries, Fourth Amendment protections do not disappear entirely. Administrative inspections must still be reasonable. See *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'").

To be eligible for the exception, administrative inspections in pervasively regulated industries must meet a three-part reasonableness test: (1) the regulatory scheme must be informed by a substantial government interest; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the inspection program must provide a constitutionally adequate substitute for a warrant. *New York v. Burger*, 482 U.S. 691, 702-03 (1987). Our Fourth Amendment

analysis of the ELD mandate requires two steps. First, we hold
that commercial trucking is a pervasively regulated industry.
We then explain why the ELD mandate is a "reasonable" ad-
ministrative inspection within the meaning of the Fourth
Amendment.

### 1. *Pervasively Regulated Industries*

At least six other circuits have concluded that the industry
is pervasively regulated for purposes of the Fourth Amend-
ment. See *United States v. Delgado*, 545 F.3d 1195, 1201-02 (9th
Cir. 2008) (collecting cases). We agree.

The Supreme Court first examined the pervasively regu-
lated industry exception in *Colonnade Catering Corp. v. United
States*, 397 U.S. 72 (1970), and returned to it most recently in
*City of Los Angeles v. Patel*, 576 U.S. —, —, 135 S. Ct. 2443, 2454–
57 (2015). The Court has recognized four industries that fall
within this exception: the sale of liquor, *Colonnade Catering
Corp.*, 397 U.S. at 72; dealing in firearms, *United States v.
Biswell*, 406 U.S. 311 (1972); mining, *Donovan v. Dewey*, 452 U.S.
594 (1981); and automobile junkyards, *New York v. Burger*, 482
U.S. 691 (1987). The Court has also held that two industries
are *not* pervasively regulated. *Barlow's, Inc.*, 436 U.S. at 313–14
(rejecting argument that "all businesses involved in interstate
commerce" are pervasively regulated); *Patel*, 576 U.S. at —,
135 S. Ct. at 2454–56 (hotels are not pervasively regulated).

The Court has relied on three primary factors to determine
if a particular industry is pervasively regulated: (1) the history
of regulation in that industry; (2) the comprehensiveness of
the regulations; and most recently (3) any inherent danger in
the industry. We consider these factors in turn.

"History is relevant when determining whether an industry is closely regulated." *Patel*, 576 U.S. at —, 135 S. Ct. at 2455; see also *Barlow's, Inc.*, 436 U.S. at 313 (firearms industry had "such a history of government oversight that no reasonable expectation of privacy … could exist"). Regulation of commercial trucking has deep historical roots. See *supra*, Part I-A. The federal government has regulated the industry since 1935, and individual states imposed regulations even earlier.

In addition to the history of general regulation, hours of service rules have been in place since 1935. As the Supreme Court noted in *Patel*, a history of regulation that is unrelated to the administrative inspection would carry less force. See *Patel*, 576 U.S. at —, 135 S. Ct. at 2455 (noting that historical regulations requiring inns to provide accommodations to all paying guests were unrelated to contemporary question of warrantless inspections of hotel guest registries). Commercial trucking has a long history of not only general regulation, but also rules governing the length of time drivers may stay on the road. See Federal Motor Carrier Act of 1935, Pub. L. No. 255, § 201, 49 Stat. 543. The ELD mandate updates those rule to capture essentially the same information while reducing opportunities for falsification or human error. This factor weighs in favor of treating commercial trucking as pervasively regulated.

The Supreme Court also considers the comprehensiveness of regulation in an industry. See, e.g., *Burger*, 482 U.S. at 705 n.16 ("[T]he proper focus is on whether the 'regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'"), quoting *Dewey*, 452 U.S. at 600. The

comprehensiveness of trucking regulation also helps to establish that industry participants have a diminished expectation of privacy.

The commercial trucking industry is regulated extensively. Federal regulations govern a host of issues ranging from driver qualifications, procedures for driver disqualification, inspection of vehicles, vehicle parts, reporting accidents, and repair and maintenance, to transportation of hazardous materials, minimum levels of financial responsibility for motor carriers, and more. See 49 C.F.R. §§ 100–399. States also impose significant regulations on commercial motor vehicles. See, e.g., 92 Ill. Adm. Code § 340-97; 140 Ind. Admin. Code § 7-3; Wis. Adm. Code Trans. § 177. This factor also weighs in favor of considering the commercial trucking industry to be pervasively regulated.

Finally, the Supreme Court signaled in *Patel* that courts should consider whether the industry is inherently dangerous. See *Patel*, 576 U.S. at —, 135 S. Ct. at 2454 (distinguishing hotels from pervasively regulated industries because "nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare"). This factor also supports treating commercial trucking as pervasively regulated.

Congress has long recognized commercial trucking as a dangerous industry. Danger to the public has lain at the center of the hours of service rules since 1935. See, e.g., 79 Cong. Rec. 12,212 (1935) (statement of Rep. Monaghan) (coining term "truckathon" to describe the "brutal, inhumane, and dangerous practice whereby drivers of busses and trucks are compelled to work 18 to 20 hours a day, to the detriment of their own health and the danger of the public who travel the highways of our country").

Such dangers led us to reject a Fourth Amendment challenge to random drug tests for drivers of city-owned trucks in *Krieg v. Seybold*, 481 F.3d 512 (7th Cir. 2007). We determined that operating "large vehicles and equipment" was a "safety-sensitive job," *id*. at 518, noting that the job was "fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences." *Id*., quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 628 (1989). The agency's estimate regarding the public safety benefits of ELDs indicates the dangerousness of the industry: ELDs are estimated to save 26 lives, prevent 562 injuries, and avoid 1,844 vehicles crashes per year. U.S. Dep't Trans., Regulatory Impact Analysis, Executive Summary at vi, Table 4 (Nov. 2015). All of these factors thus weigh in favor of treating commercial trucking as a dangerous industry. For purposes of the Fourth Amendment, commercial trucking is a pervasively regulated industry.

### 2. *Reasonableness of the ELD Mandate*

The ELD mandate must still pass a three-part reasonableness test: (1) the regulatory scheme must be informed by a substantial government interest; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the inspection program must provide a constitutionally adequate substitute for a warrant.

We have already addressed the first element. The public safety concerns inherent in commercial trucking give the government a substantial interest.

The ELD mandate also meets the second element. ELD records and administrative inspection of them are necessary to further the government's regulatory scheme. As noted above,

falsification and errors in the traditional paper records are a widespread problem. See *supra*, Part I-A; 65 Fed. Reg. 25,540, 25,558 (May 2, 2000). During the agency's listening sessions, drivers said that motor carriers sometimes pressure them to alter their paper records. Final ELD Rule, 80 Fed. Reg. at 78,320, 78,323, 78,325. Automatic recording and warrantless inspection of those records offer a reasonable method to combat this problem. ELDs should not only help discover hours of service violations but also deter such violations.

Warrantless inspection of hours of service records at roadside inspections and during audits is not new. Such reviews of the paper records have long been central to enforcement of the hours of service. See 49 C.F.R. § 395.8(k)(2) (2014). Since the search occurs when law enforcement reviews the hours of service data—not during the driver's collection and storage of the data—ELDs do not create a search regimen substantially different from what has occurred with the paper records for generations of drivers. Making the records more reliable does not affect the reasonableness of the resulting searches. It is also a reasonable way to achieve the regulatory goals.

The ELD mandate meets the third element because the agency provides a constitutionally adequate substitute for a warrant. To meet this third requirement, the inspection must (1) advise the owner of the commercial property that the search is made pursuant to the law and has a properly defined scope, and (2) must limit the discretion of the inspecting officers. *Burger*, 482 U.S. at 703. The ELD mandate does both.

First, 49 C.F.R. § 395.24(d) and § 395.22(j) advise drivers and motor carriers that authorized safety officials may search ELD data pursuant to law. The rules also limit the scope of the inspections to ELD records. *Id.*; see also Final ELD Rule, 80

Fed. Reg. at 78,296–97. In addition, the data recorded by ELDs are intentionally limited, restricting the scope of the information available to law enforcement. *Id.* at 78,322–23.

Next, the discretion of inspecting officers is limited in two important ways. First, the ELD mandate authorizes officers to inspect only ELD data; it does not provide discretion to search a vehicle more broadly. Second, § 31137(e)(3) requires the agency to take steps to ensure that law enforcement uses ELDs only to enforce compliance with the hours of service rules. The agency acknowledged this during rulemaking, Final ELD Rule, 80 Fed. Reg. at 78,322, and the agency issued a memorandum limiting the use of ELD records to enforcement of the hours of service requirements. Memorandum from William A. Quade, Assoc. Adm'r for Enforcement, Federal Motor Carrier Admin. (Dec. 4, 2015).[4] Taken together, these protections create a constitutionally adequate substitute for a warrant in the commercial trucking industry. Because the agency's promulgation of the ELD mandate passes the three-part test of *Burger*, it is reasonable within the meaning of the Fourth Amendment.

Accordingly, the Federal Motor Carrier Safety Administration's final ELD rule codified at 49 C.F.R. Pts. 385, 386, 390,

---

[4] We take judicial notice of the memorandum under Fed. R. Evid. 201. See *Fornalik v. Perryman*, 223 F.3d 523, 529 (7th Cir. 2000); *United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir. 1999). Petitioners had an opportunity to file supplemental briefing regarding this document. The memorandum did not need to be issued by notice-and-comment rulemaking. While the statute elsewhere requires the Secretary to proceed by regulation, see 49 U.S.C. § 31137(a), the provision in question here requires only that the Secretary "institute appropriate measures." § 31337(e)(3). The memorandum meets that requirement.

and 395 is not arbitrary or capricious, nor does it violate the Fourth Amendment. The petition for review is DENIED.